SEAWAY NATIONAL BANK, Plaintiff-Appellee, v. ERVIN CAIN, Defendant-Appellant.

First District (6th Division)   No. 1—92—0967

Opinion filed January 28, 1994.

Jerome S. Feder and Harold A. Liebenson, both of Chicago, for appellant.

Ira T. Nevel, of Chicago, for appellee.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Ervin Cain, appeals from a finding in favor of the plaintiff, Seaway National Bank (Seaway), on Cain's two-count counterclaim; count I alleged a violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1991, ch. 121$^1$/$_2$, par. 262); count II was a claim for restitution.

On January 4, 1977, Seaway loaned Cain $12,900, secured by a trust deed and installment note, to finance Cain's purchase of a parcel of commercial real estate improved with a gasoline station, located at 1800 East 79th Street in Chicago. Cain agreed to pay Seaway $138.63 per month for principal and interest. For the real estate taxes, the installment note contained a separate provision that read:

> "[Cain] also agrees to deposit monthly at the same time as principal and interest payments are due hereunder, into an account to be designated by the [Seaway], a sum equal to $^1$/$_{12}$th of the annual costs for real estate taxes (as determined from time to time by [Seaway]) which sums may be used from time to time for payment on account of such obligations."

On February 14, 1983, Seaway filed a complaint to foreclose the mortgage, alleging that Cain was in default as of October 15, 1982.

On November 8, 1983, Judge Albert Porter entered an order of default, judgement of foreclosure, and order of sale. The property was sold to Seaway at a sheriff's sale and approved by Judge Porter on January 11, 1984. On September 26, 1984, Cain filed a motion to quash the return of service and, alternatively, a motion to vacate the order of default, judgment of foreclosure, order of sale, and sheriff's sale. In his affidavit, Cain alleged that he was not aware of the foreclosure action and that Seaway accepted his monthly payments during the entire pendency of the foreclosure action and sheriff's sale. Seaway answered that Cain's payments were received but were untimely and that certain payments were applied to accrued interest. Seaway maintained that Cain was not current in his mortgage payments for the years 1982 and 1983 and stated that it instructed counsel not to pursue the foreclosure action while Cain was making payments.

On June 17, 1985, Judge Charles Freeman vacated the order of default, judgment of foreclosure and sale, and approval of sale that had been entered by Judge Porter. On October 17, 1985, Seaway filed

its amended complaint, alleging that $26,749.32 was due for principal, interest, and real estate taxes. The complaint did not set forth any breakdown for the amount that was allegedly due, but stated only, "[T]here remains due and owing the Plaintiff as of September 5, 1985 the sum of $26,749.32 on the Principal Note described above, which includes amounts advanced for real estate taxes, negative escrow balance of $188.98 and interest of $3,181.58 due from December 5, 1983 to October 5, 1985." Cain answered the amended complaint and denied all allegations.

On March 5, 1986, Seaway filed a motion for summary judgment and a motion for default of mortgage. The motion was granted by Judge George Marovich and then vacated by Judge Freeman because Cain did not receive notice of the motion or the hearing. After Cain responded to Seaway's motion for summary judgment and appeared at the hearing, Judge Freeman granted the motion for summary judgment and entered an order of default. Judge Freeman's order of June 16, 1986, stated that the foreclosure and sheriff's sale would be stayed if Cain posted a $20,000 appeal bond. On July 10, 1986, Cain filed a notice of appeal but failed to file a bond. On July 22, 1986, the sheriff conducted a public sale, and Seaway was the successful bidder. On July 29, 1986, Judge Freeman approved the sale. By contract dated January 12, 1987, Seaway sold the property to a third party.

On March 12, 1988, this court reversed summary judgment in favor of Seaway by an unpublished order. (134 Ill. 2d R. 23.) The order held that material facts were in dispute and that summary judgment was inappropriate.

After remand, on September 14, 1990, Cain filed his amended answer and also filed a counterclaim based on Seaway's alleged violation of the Consumer Fraud Act. Cain alleged that an "escrow" account was established for the payment of real estate taxes pursuant to the terms of the installment note; that this account was a "special account"; that the monies deposited in this account should not have been commingled with Seaway's other deposits; and that this account created a trustee-beneficiary relationship between Seaway and Cain. Cain also alleged that Seaway breached its fiduciary obligations to Cain because Seaway either failed to deposit his tax payments into the special account or failed to pay the taxes when they became due and that Seaway failed to advise Cain of its failure to pay taxes and of the subsequent forfeiture and redemption. Cain further alleged that Seaway wrongfully claimed that he was in default and accelerated the due date of the principal balance.

Trial began on January 10, 1992, before Judge Francis Barth. Seaway's attorney informed the judge that the trial would focus only

on Cain's counterclaim and that the original foreclosure action would be dismissed pursuant to an agreement. Seaway's attorney explained why the foreclosure action was being dismissed: that the foreclosed property had been sold. He also expressly said that the agreement was made with the clear understanding that the foreclosure had not been wrongful, that it had been done pursuant to the original judgment. The judge said: "So it's understood that we are proceeding today upon the counterclaim?" Cain's attorney answered, "Our counterclaim."

Cain called Richard Abrams, executive vice-president and chief operating officer at Seaway. Abrams testified that the bank makes tax payments twice a year, and it periodically analyzes the escrow to determine if the funds are sufficient to pay the taxes. Chicago Title & Trust Company sends the bank information on the tax liability of each parcel. Based on that information, the bank asks the customer to make an adjustment in the monthly installment payments. The bank would notify the customer by letter that more money is needed to pay the taxes, and if the customer did not receive the notice, then the higher amount needed would show up on the monthly statement. The bank used escrow savings accounts for the real estate taxes. Those accounts have their own class code in the bank's accounting procedure; the tax escrow account is a separate and distinct account. Abrams referred to this account as a "special deposit." Those accounts are commingled with the general funds of the bank. The general policy of the bank provides that the senior lending officer may pay up to $500 for a deficiency but any amount in excess of $500 needs the approval of the executive committee. If a customer did not have an adequate escrow, the bank would advance the funds and then debit the principal of the loan for the amount of advanced funds.

The bank paid $10,181.72 to the Cook County assessor for redemption for the taxes in 1978, 1979, and 1980 on the subject property. That amount was then added to Cain's principal amount. In 1980, Cain's escrow balance totalled $5,751.29, but that amount was not applied toward the redemption. Abrams testified that the escrow funds should have been applied, but he did not know if the bank ever notified Cain that the taxes were not paid. From 1981 to 1982, Cain made only 10 payments while 12 were due. For the 1984 year, Cain only made three payments. Paragraph two of the trust deed states that the mortgagor shall pay the taxes before any penalty attaches. Paragraph four states that in case of a default, the bank could pay the delinquent taxes to protect its interest.

Cain testified that the bank sent him monthly statements, that the bank received the tax bill, and that he never received a tax bill

on the property. If he was late or missed a payment, he would make a double payment during the next month. No one from the bank ever told him that the taxes were paid from 1977 to 1983 or that the taxes were not paid for those years. In 1979, he received a letter from the bank that indicated that it had paid the taxes. He received no other letters from the bank. He was not informed of any deficiency in 1983 before the bank filed its original foreclosure action. He was never more than 90 days behind in his payments. In 1984, the bank refused to accept any more payments. On cross-examination he admitted that he missed a payment in 1982 and in 1981. He acknowledged that the 1977, 1978, 1979 and 1980 tax bills were addressed to his home. In 1981, the tax bill went to the bank.

Seaway later called Cain as an adverse witness. He testified that he did not know that the taxes were delinquent, even though the tax bills were sent to him, until his lawyer told him in 1984. (At his deposition, Cain had testified that he did not know of the tax delinquency until 1985 when he hired another lawyer.) He testified that the bank told him at his closing that it would pay the taxes until the mortgage was paid off. In 1982 he did not receive some of his mail at home because he was going through a divorce. He never knew if the taxes were going up. He did not know about any appeal bond or that it would stay enforcement of the sheriff's sale. He could not have come up with the money for the bond. Although some of the payments were behind, he made all of the required payments from 1977 to 1983.

Lorraine Lynch, an assistant vice-president and audit manager for Seaway, testified that Cain's account became delinquent with the August 1982 payment that was not made until October 15, 1982. Late payments were applied to the oldest outstanding payment due. She did not know how the bank treated the tax escrow monies. Cain made a payment on January 10, 1984. In February 1984, the bank stopped accepting Cain's payments because he was in default. The bank accepted Cain's July 1984 payment and then returned it.

Lorette Yamini, vice-president and senior lender of Seaway, testified that the real estate taxes were the responsibility of Cain. The bank relied on Cain to give it the tax bills until 1983 when the bank then relied on a tape system of tax information from the Chicago Title & Trust Company. Cain, however, did not bring in the tax bills, even though the bank requested him to do so. In 1980, Yamini had the tax bills sent by the assessor to the bank.

Cain's late payments were accepted by the bank because the tellers who collected the payments did not know that the property was in foreclosure. When Yamini found out that payments were

accepted, she changed bank policy so that payments were accepted only by a loan officer. She informed the tellers that they were not to accept payments on any delinquent accounts. She first discussed the escrow shortage with Cain after he received notice that the bank was foreclosing. She told him that there was a shortage in his escrow because the bank had to advance monies for the taxes. Those funds that were advanced were then added to his principal balance. To solve this problem, she informed Cain that he could make a lump-sum payment for the taxes, but he never paid the bank. Although an account would be technically in default after 30 days, the bank would not foreclose until the account was in arrears for over 90 days. Cain made only 10 payments in 1982. In early 1984, the bank refused to accept Cain's payments because the account was delinquent.

Before closing arguments, the judge permitted Cain to amend his counterclaim to include a count for restitution. In that count, Cain alleged that the appellate court reversed and remanded the judgment for foreclosure; that Seaway dismissed its foreclosure action with prejudice; and that, as a result of Seaway selling the property to a third party and dismissing the foreclosure action, Cain was "deprived of his property without valid legal authorization of a Court and is entitled to restitution of his property and damages." The judge ruled that Cain failed to establish any violation of the Consumer Fraud Act. He expressly found that Cain had become aware of the tax problems with his property much earlier than he claimed. He pointed out a notice of delinquency from the Cook County assessor dated May 12, 1981. He also pointed out that Cain was ultimately responsible for the payment of the taxes. He found that Cain was made aware that the taxes were not being paid and that the bank did not "gull or deceive" him and that the bank worked with him at all times before the second foreclosure. He concluded that the taxes remained in a delinquent state through the fault of Cain. He also found that there was "ample evidence to support the claim that there was communication between Mr. Cain and the bank with regard to continuing problems due to his delinquency and the implication that these delinquencies were having upon the status of his account, including the tax escrow, that his tax escrow was falling short."

Cain first maintains that Seaway's voluntary dismissal of its foreclosure complaint with prejudice constituted an adjudication on the merits in favor of Cain on both his claims and, consequently, entitled him to judgment on the basis of the doctrine of *res judicata*.

The case of *Caporale v. Shannon Plumbing Co.* (1974), 20 Ill. App. 3d 511, 314 N.E.2d 540, is a clear refutation of Cain's argument. In *Caporale*, the plaintiffs filed suit in one division of the circuit court to

collect trust funds pursuant to a collective bargaining agreement that were not paid from 1968 to 1970. The plaintiffs filed a second suit in another division of the circuit court to collect funds that were not paid from 1968 to 1973. The two suits were consolidated, and the first case was dismissed with prejudice. Judgment was entered for the plaintiffs in the second suit and damages were awarded for contributions not paid from 1968 to 1973. The defendants filed a motion to vacate the judgment on the ground that the dismissal of the first suit was an adjudication on the merits in favor of the defendants as to the amounts due from 1968 to 1970.

The appellate court disagreed with the defendant's argument and noted that the defendants did not raise the previous adjudication until after the judgment was rendered against them in the second suit. The court stated:

> "Participation in such re-litigation through judgment on the merits, with no reason given for the failure to raise it, must be deemed a waiver of res judicata." *Caporale*, 20 Ill. App. 3d at 513.

The court concluded that the defendants' agreement to a dismissal for administrative convenience and participation to judgment estopped them from claiming that the dismissal was an adjudication on the merits.

■ The facts and reasoning of *Caporale* are applicable here. Cain agreed to the dismissal with prejudice in order to save time at the beginning of the trial. Cain knew that trial would proceed on his consumer fraud claim, and he later added a restitution claim. He fully litigated the issues of wrongful foreclosure and consumer fraud to judgment. He never raised the argument that Seaway's dismissal was an adjudication on the merits. We conclude that he is now estopped from doing so.

Cain next contends that the judge's decision that Seaway did not violate the Consumer Fraud Act was against the manifest weight of the evidence. He maintains that the tax escrow should be deemed a "special deposit" and that Seaway owed him a fiduciary duty with respect to the account. He lists Seaway's alleged breach of fiduciary duties as failures to: adequately account for the status of the account, advise of necessary increases to cover increased taxes, and to properly treat the monies as a segregated account that should not have been applied to principal or interest.

The judge found that Cain was not "gulled or deceived" by Seaway to the point that Cain would be unable to correct the tax deficiency and that Seaway did not engage in any scheme or wrongdoing to deprive Cain of his property. The judge also found that the mortgage was delinquent at the time of the original and amended

foreclosure. He expressly found that Cain was "aware of and should have been aware of" the nonpayment of taxes. He concluded that the failure to pay the taxes was Cain's fault and not the fault of the bank which advanced his funds. He expressly found that Cain knew of the delinquent taxes in 1981, that the real estate taxes were the obligation of Cain, and that payment of tax escrow did not relieve him of his obligation to pay the taxes.

■ No case offered by Cain supports his contention that Seaway breached any fiduciary duty. In fact, Cain has not submitted any case which would support his claim that Seaway was his fiduciary.

In *Durkee v. Franklin Savings Association* (1974), 17 Ill. App. 3d 978, 309 N.E.2d 118, the appellate court held that the monthly tax payments did not constitute special deposits or trust funds. The court noted that general deposits give rise to a debtor-creditor relationship between the bank and the depositor. Special deposits, sometimes equivalent to a bailment, arise if it is the duty of the bank to hold a sum to be kept separate from the bank's other funds. The court also reasoned that even if the monies were considered deposits, the tax monies were commingled with the other funds of the bank and, therefore, were not "special" deposits.

In the case before us, as noted, Cain's tax monies were commingled with the general funds of the bank. Even though Cain may not prevail on his special deposit argument, the question arises whether Seaway's alleged mishandling amounted to a deceptive practice under the Consumer Fraud Act. Cain alleges that he was told that he did not have to pay the taxes until after the mortgage was paid off, despite the fact that the terms of the note stated that he was ultimately responsible for the taxes. Seaway contends that Cain did know of the tax problem, that he did not answer the bank's correspondence and that the bank did not deceive him in any way. In any event, Seaway maintains, the evidence supported the judge's findings of fact. We agree.

In *Bankier v. First Federal Savings & Loan Association* (1992), 225 Ill. App. 3d 864, 588 N.E.2d 391, the appellate court held that the Consumer Fraud Act did not apply to a suit where the plaintiff alleged that the bank's charge of a prepayment penalty on a loan was deceptive. The plaintiffs had contended that the bank created a variety of closing documents which were confusing and misleading and that the loan officer made false and deceptive statements about the applicability of prepayment penalties in contract documents. The bank contended that the Act did not apply. The appellate court held that the Act did apply to mortgage lenders, but that the type of transaction involved was not meant to be covered by the Act; the

plaintiffs alleged a purely private wrong that involved the construction of contract documents and that the Act did not apply to simple breach of contract claims. The court concluded that the plaintiffs' claims involved merely a breach of contract claim between a borrower and a lender.

In this case, Cain's fraud claim is really a breach of contract claim that involves the construction of Cain's loan documents. His claim hinges on whose duty it was to pay the taxes and whether Seaway had a duty to inform him of the status of his account. Those duties and obligations arise from the contractual relationship that was formed by the installment note; thus, Cain's claim arises from an interpretation of that note, and his claim is not based on any fiduciary duty. We conclude that his claim is merely a breach of contract claim.

■ We turn now to the question of the manifest weight of the evidence. Cain testified that he did not know of any tax problem, but Yamini testified that she sent numerous notifications to him and that he had received the tax bills until 1980. Cain also claimed that he received no information from 1977 until 1983 concerning taxes, but he did receive his monthly statements. Yamini testified that she sent a letter to Cain in 1977 about the taxes being due and that Cain knew the taxes were his responsibility. Cain's testimony that he was told that he did not have to pay the taxes is clearly contradicted by the terms of the installment note. We conclude, therefore, that the judge's findings were not against the manifest weight of the evidence.

In view of our conclusion that the judge's findings of no liability must be affirmed, we need not discuss the propriety of the judge's ruling barring an appraiser witness called by Cain. That witness' testimony was relevant only on the question of damages.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.